## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHARLES B., JR.,

                 Plaintiff,

      v.

ANDREW M. SAUL,
Commissioner of Social Security,

                 Defendant.

Case No. 19 C 1980

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles B., Jr.[1] seeks judicial review of the final decision of the Commissioner of Social Security finding him ineligible for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act prior to April 9, 2013. Charles asks the Court to reverse and remand the ALJ's decision, and the Commissioner moves for its affirmance. For the following reasons, Charles's motion [15] is granted in part, and the Commissioner's motion [22] is denied. The ALJ's decision is reversed and this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## BACKGROUND

A few days after receiving shoulder surgery in February 2007, Charles began experiencing pain and swelling in his left calf and ankle. (R. 1014-15, 1024). A venous duplex scan showed that Charles was suffering from acute deep vein thrombosis (DVT).

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by his first name and the first initial of her last name or alternatively, by first name.

*Id.* at 1024.  Genetic testing a couple of months later revealed a genetic mutation, and doctors prescribed anticoagulants. *Id.* at 965-66.  In January 2008, when Charles continued experiencing swelling and pain in his left leg and additional imaging confirmed DVT, Charles's doctors opined that long-term anticoagulant therapy was appropriate. *Id.* at 754-55.  Doctors further instructed Charles to wear compression socks and elevate his legs. *See, e.g.*, *id.* at 756, 1734.  Eventually in April 2012, doctors surgically inserted a trapeze inferior vena caval filter. *Id.* at 891.  At the same time Charles was suffering from complications from his DVT, he was also battling depression. *Id.* at 789-90.  Charles was hospitalized after admitting to suicidal ideation in July 2010 and again in February 2011 after attempting suicide by overdose. *Id.* at 784-85, 815-16.  In April 2012, a mental status examination reflected that Charles had impaired insight and judgement. *Id.* at 881.  To seek relief from his genetic mutation, DVT, and depression, Charles reported to emergency rooms and the county health department, underwent therapy, and utilized prescription medications, including Coumadin, Lovenox, and Cymbalta. *See, e.g.*, *id.* at 714, 751, 752, 784, 804.

Charles filed his application for disability insurance benefits in April 2012 and for supplemental security income in August 2014, claiming he became unable to work at age 34, due to coagulopathy pulmonary embolus, lupus anticoagulant, high blood pressure, and depression. (R. 248, 492-93, 549).  Charles alleged that his disability began in January 2007. *Id.* at 492.  After hearings were held in June and December 2015, ALJ Patricia Supergan issued a decision in May 2016 denying Charles's disability claim. *Id.* at 245-67.  The Appeals Council subsequently remanded Charles's case to the ALJ, and another hearing was held in March 2018. *Id.* at 52-104.  At that hearing, also before ALJ

Supergan, the ALJ heard testimony from Charles, a medical expert, Dr. Ashok Jilhewar, and a vocational expert, Ronald Malik. *Id.*

On June 21, 2018, the ALJ issued a partially favorable decision, finding Charles disabled as of April 9, 2013, but not before. (R. 14-35). The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920(a). At step one, the ALJ found that Charles had not engaged in substantial gainful activity since January 23, 2007, the alleged onset date. *Id.* at 17-18. At step two, the ALJ found that Charles had the severe impairments of lupus anticoagulant syndrome and gene mutations associated with increased risk of venous thrombosis, tobacco use disorder, and depression. *Id.* at 18. At step three, the ALJ determined that, prior to April 9, 2013, Charles did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526, 416.920(d), 416.925, and 416.926). *Id.* at 18-20.

The ALJ then concluded that prior to April 9, 2013, Charles retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a), except:

> he could occasionally climb ramps and stairs, but never ladders, ropes or scaffolds. He could occasionally balance and stoop, but never kneel, crouch or crawl. He could frequently reach in all directions including overhead with both upper extremities; frequently handle, finger and feel with both upper extremities. He can tolerate occasional exposure to and work around extreme cold and heat, wetness, humidity, vibration and fumes, gases, and other pulmonary irritants. He cannot tolerate any exposure or work around hazards such as moving machinery or unprotected heights. He can perform work involving simple routine tasks requiring no more than short simple instructions and simple work-related decision making with few workplace changes.

3

(R. 20). Based on this RFC, the ALJ determined at step four that Charles could not perform his past relevant work as a water treatment operator or plumber. *Id.* at 30-31. At step five, the ALJ found that, prior to April 9, 2013, there were jobs that existed in significant numbers in the national economy that Charles could have performed. *Id.* at 31-32. Specifically, the ALJ found that Charles could have worked as a document preparer, addresser, or waxer.[2] The Appeals Council denied Charles's request for review on January 22, 2019, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-4; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4);

---

[2] The ALJ mistakenly listed the occupation as "faxer," but the vocational expert testified to the job of "waxer," DOT 779.687-038 (R. 101).

4

20 C.F.R. § 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and h[is] conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Charles raises two general issues in support of his request for reversal of the ALJ's decision: (1) the ALJ erred in assessing Charles's RFC; and (2) the ALJ erred in assessing Charles's subjective allegations addressing the intensity, persistence and limiting effects of Charles's pain and symptoms. *See* Doc. [15].  Within those broad arguments, Charles has identified errors warranting remand.  Specifically, the ALJ failed to build an accurate and logical bridge with respect to her decision to omit a leg elevation requirement in Charles's RFC, and the ALJ committed multiple subjective symptom analysis errors, such that the subjective symptom analysis is patently wrong.[3]  The Court accordingly remands the ALJ's decision.

## A.      Leg Elevation

Charles argues that the ALJ failed to explain why she excluded a functional restriction that would have permitted Charles to elevate the legs to alleviate swelling during the workday from her assessment of Charles's RFC, and that that failure constituted a harmful error in this case. Doc. [15] at 6-7.  The Court agrees.

In crafting an individual's RFC, an ALJ must evaluate all limitations that arise from a medically determinable impairment and cannot ignore a line of evidence contrary to the ruling. *See Villano*, 556 F.3d at 563.  The RFC determination should include a discussion describing how the evidence, both objective and subjective, supports the ultimate conclusion. *Briscoe ex rel. v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  While an ALJ need not discuss every piece of evidence, she must still articulate, "at some minimum level," her analysis of the evidence. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005) (internal quotation marks and citations omitted); *see Brindisi ex rel. v. Barnhart*, 315 F.3d

---

[3] Because the Court remands on these bases, the Court does not address Charles's other arguments.

783, 786 (7th Cir. 2003). Put another way, the ALJ "must confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Taylor v. Colvin*, 829 F.3d 799, 802 (7th Cir. 2016) (internal quotation marks and citations omitted).

In *Smith v. Astrue*, the Seventh Circuit remanded the decision of an ALJ who explained her decision to exclude a leg elevation requirement with a "cursory comment" that "[t]he medical records do not support the limitations alleged by the claimant that she is medically required to elevate her legs." 467 F. App'x 507, at 510 (7th Cir. 2012). The *Smith* Court found that the "perfunctory nature of the ALJ's discussion of leg elevation" failed to build the requisite logical bridge connecting the evidence to her decision. *Id.* While the ALJ in *Smith* did cite to some medical records, the Seventh Circuit emphasized that the ALJ "did not explain *how* the records undermined [the claimant's] testimony that she needed to elevate her leg." *Id.* (emphasis in original). The court further stressed that there was evidence in the record to support the claimant's need for leg elevation, such as the claimant's testimony and agency reports, records from a hospital stay, and records from follow-up appointments, during which time "the edema in her leg was characterized as either 'moderate' or 'severe.'" *Id.* at 510-11.

Following *Smith*, courts in this Circuit have remanded the decisions of ALJs who fail to include record-supported leg elevation requirements without adequately explaining why. *See, e.g.*, *Rouse v. Comm'r of Soc. Sec.*, No. 1:16-CV-420-TLS, 2018 WL 480829, at *5-6 (N.D. Ind. Jan. 19, 2018) (remanding where ALJ acknowledged claimant's testimony that she needed to elevate her feet but "did not explain why the Plaintiff's RFC did not include a functional restriction that would allow the Plaintiff to elevate her legs and feet"); *Gonzalez v. Colvin*, No. 12 CV 10262, 2014 WL 4627833, at *7 (N.D. Ill. Sept. 16, 2014)

(remanding and holding that ALJ should expressly address claimant's alleged need to elevate his leg and "either explain why she rejects it or discuss how it fits into her RFC assessment" where numerous records showed claimant's knee swelling); *Robinson v. Colvin*, No. 13 C 1654, 2014 WL 2119270, at *8-9 (N.D. Ill. May 21, 2014) (remanding where ALJ failed to address claimant's testimony about leg elevation and did not explain why she did not believe claimant's testimony); *Burton v. Astrue*, No. 11-3164, 2012 WL 2905363, at *10-11 (C.D. Ill. July 16, 2012) (remanding where ALJ mentioned claimant's testimony about need to elevate the leg and then used meaningless boilerplate language which was unhelpful in building logical bridge).

Whereas courts in this Circuit have affirmed decisions excluding a leg elevation requirement when such a requirement is not supported by the medical record. *See Blanchard v. Saul*, No. 18-CV-1166, 2019 WL 3220397, at *4 (E.D. Wis. July 15, 2019) ("Blanchard does not present any evidence, besides his own testimony, showing that he needs to elevate his legs during the day."); *Browning v. Astrue*, No. 10 CV 7129, 2011 WL 5042048, at *6 (N.D. Ill. Oct. 20, 2011) ("The ALJ compared [claimant's] testimony with the medical records and found no medical confirmation of her need to elevate her feet.").

Here, Charles's need for a leg-elevation requirement is well-supported by the record. Charles testified that he elevated his legs higher than his shoulders during the relevant time period because it helped with the pain and swelling he was experiencing. (R. 181). Charles even asked to elevate his leg at two of his administrative hearings. *Id.* at 112-13, 174-75. Charles also testified that his hematologist constantly told him to elevate his legs above the heart. *Id.* at 181. Consistent with that testimony, at least two of Charles's doctors recommended that he elevate his legs. On July 5, 2007, Charles reported to Dr.

Cataldo when he was experiencing swelling in his left leg. *Id.* at 1734. Dr. Cataldo prescribed Charles compression hose and recommended that Charles elevate his legs. *Id.* On July 1, 2009, Dr. Lakhani observed swelling in Charles's left leg extending from his ankle to the thigh. *Id.* at 1755. Dr. Lakhani accordingly instructed Charles to keep his leg elevated when he was in bed and while sitting. *Id.* at 1757. Later that month, Charles reported to Dr. Lakhani again, who observed that Charles's leg swelling had decreased. *Id.* at 1753. Even so, Dr. Lakhani confirmed that Charles needed to keep his legs elevated while sitting or lying in bed. *Id.* at 1754. Charles reported to at least one doctor that he was attempting to elevate his leg. *Id.* at 754. Moreover, Charles's medical records show that he consistently had swelling in his left lower leg throughout the relevant time period. *See, e.g.*, *id.* at 739, 752, 807, 884, 938, 941, 943, 946, 1733, 1736. In sum, the record evidence in this case went beyond the claimant's statements.

The ALJ's mere acknowledgement of Charles's testimony and the medical records in this case fails to build an accurate and logical bridge for excluding a leg elevation requirement. The ALJ mentioned Charles's leg elevation testimony, as well as the aforementioned recommendations from his doctors that he elevate his legs. (R. 21, 22, 23). Yet, beyond that, the ALJ's decision includes no further discussion on the leg elevation requirement. Like the ALJ in *Smith*, the ALJ here failed to explain how any of Charles's medical records undermined Charles's testimony that he needed to elevate his leg. 467 Fed. App'x at 510. The ALJ likewise failed to explain why she discounted the evidence in the record that illustrated a need for Charles to elevate his leg. In *Smith*, the ALJ at least stated that "[t]he medical records do not support the limitations alleged by the claimant that she

is medically required to elevate her legs." *Id.* Here, the ALJ did not even offer up that type of conclusory explanation.

The Court is mindful that an ALJ's decision merits a good deal of deference and need not be perfect. *See Biestek*, 139 S.Ct. at 1154. Even so, the Court cannot trace the ALJ's reasoning in omitting a leg elevation requirement in this case. Perhaps the ALJ rejected the requirement because she disbelieved Charles's testimony. Without further elaboration, the Court cannot say. Even if the ALJ rejected the leg elevation requirement based on her subjective symptom analysis, that analysis (as will be discussed further below) is patently wrong and therefore cannot support the ALJ's decision. *Cf Cruzado v. Colvin*, No. 13 C 6220, 2015 WL 5093790, at *9 (N.D. Ill. Aug. 26, 2015) (affirming ALJ's rejection of leg elevation requirement where ALJ adequately supported her adverse credibility determination). In any event, the ALJ would still need to grapple with the medical opinions in the record stating that Charles needed to elevate his leg.

Unfortunately, the ALJ's weighing of medical opinions in this case does not add clarity. In her discussion of Dr. Lakhani, the ALJ stated that she gave "some weight" to his statements but did not address his opinion that Charles had to elevate his leg. (R. 29). The ALJ did not weigh Dr. Cataldo's opinions at all. While it is true that the state agency physicians and medical experts did not opine that a leg elevation requirement was necessary during the relevant time period, *see id.* at 95, 132-33, 205-07, 221-24, 236-240, the ALJ did not discuss those portions of the medical opinions, so the Court is left unable to meaningfully review the ALJ's decision. For instance, the ALJ only discussed the medical experts' opinions regarding Listing 4.11, so the Court does not know what weight the ALJ gave, if any, to the experts' opinions regarding the need for leg elevation during

the relevant time period. *Id.* at 28-29. With respect to the state agency physicians' physical RFC findings, the ALJ stated only: "I have assigned some weight to the opinions of the state agency medical consultants who opined the claimant could engage in light work with occasional climbing of ramps and stairs, no climbing of ladders, ropes and scaffolds, occasional kneeling, crouching, and crawling, limited overhead reaching on the right and a limitation to avoid concentrated exposure to hazards." *Id.* at 30. The ALJ's single sentence that she assigned "some weight" to the state agency physicians' opinions, like the ALJ's other medical opinion articulations, fails to illuminate her decision to omit a leg elevation requirement in this case. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citations omitted) (ALJ's statement that physician's opinion entitled to "some weight" was unhelpful).

The Commissioner does not provide insight into the ALJ's decision to omit a leg elevation requirement, nor does the Commissioner discuss any caselaw on the subject. Instead, the Commissioner asserts that the ALJ did not have to include a leg elevation requirement, and that "plaintiff has failed to show that his alleged need to elevate his leg during the day was a disabling functional limitation." Doc. [22] at 5. The Commissioner is correct that the ALJ does not have to include a leg elevation, but that is not Charles's argument. Charles's argument, based on *Smith v. Astrue*, is that the ALJ did not sufficiently explain why she ultimately omitted a leg elevation requirement from the RFC, given the evidence in the record. Doc. [15] at 6. And while the Commissioner is correct that the claimant has the burden of supplying adequate records to show disability,[4] *see Scheck v.*

---

[4] Along the same lines, the Commissioner avers generally—and without citation to caselaw—that the ALJ is not tasked with explaining why a claimant did not have greater limitations than the ALJ found, and that the ALJ does not have to prove a negative. Doc. [22] at 4. The Commissioner's broad statement fails to respond to Charles's specific arguments and is unhelpful to the Court.

*Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citations omitted); 42 U.S.C. § 423(d)(5)(a), Charles testified and provided a litany of medical records signaling his leg edema and need for leg elevation. The ALJ needed to grapple with this evidence, and explain why she rejected it.

In defense of the ALJ's RFC generally, the Commissioner notes that the ALJ recognized that multiple treating providers indicated that Charles was capable of work at least the sedentary level during the relevant time period. Doc. [22] at 7. It is true that the ALJ made that statement, although the Court can only find two such treating providers, not "multiple." (R. 21). The first being Dr. Lakhani. When the ALJ weighed Dr. Lakhani's opinion, she discussed Dr. Lakhani's June 2012 finding that Charles was limited to "no physically strenuous activity, but ambulatory and able to carry out light or sedentary work [ ] such as office work or light house work." *Id.* at 29. Yet, Dr. Lakhani also ordered Charles to elevate his leg on at least two occasions. *Id.* at 1753-54, 1757. As a medical doctor, and not a regulatory or vocational expert, who was making a determination based on the Eastern Cooperative Oncology Group, or ECOG scale, *see id.* at 935, it is reasonable (and not inconsistent) for Dr. Lakhani to opine both that Charles needed to elevate his leg while sitting *and* that he could perform office work or light house work. Dr. Lakhani and Charles's other treating providers were not present at Charles's hearings and did not hear the vocational expert testify that an individual who needed to elevate the leg at even knee-

---

Additionally, the ALJ does have to "confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Taylor v. Colvin*, 829 F.3d at 802.

level three times each day for one hour each time would be unable to perform the jobs that the ALJ selected for Charles. *Id.* at 102.[5]

The second provider to opine that Charles had at least a sedentary capability was an occupational therapist who was working with Charles on his shoulder, post-surgery. The occupational therapist opined in October 2007 that Charles could perform at a level of "Medium/Heavy." *Id.* at 1707. But even the ALJ recognized that the opinion was made at the beginning of the relevant time period and was contradicted by later medical records showing Charles's issues with pain and swelling in the left leg. *Id.* at 29. As a result, the fact that two of Charles's treating providers stated that he was at least capable of sedentary or light work does not explain why the ALJ declined to include a leg elevation restriction, and it does not mean the ALJ's unexplained decision to do so was supported by substantial evidence.

**B.     Subjective Symptom Analysis**

Charles argues that the ALJ erred in finding that his complaints were inconsistent with the objective medical and other evidence in the record. Doc. [15] at 12-16. The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510 (internal quotation marks and citation omitted). An ALJ must justify his evaluation with "specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citation omitted); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (citation omitted) (patently wrong "means that the decision lacks any explanation or support."). When assessing a claimant's subjective

---

[5] The vocational expert's testimony also shows why the ALJ's error in failing to build an accurate and logical bridge with respect to her decision to omit a leg elevation requirement was not harmless. If the ALJ included a leg elevation restriction that was consistent with Charles's testimony and his doctor's recommendations, he would not be qualified for the jobs that the ALJ selected for him.

symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); 20 C.F.R. § 416.929(c); SSR 16-3p, 2017 WL 5180304, at *5, *7-8 (Oct. 25, 2017). Ultimately, "the ALJ must explain her [subjective symptom evaluation] in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotation marks and citation omitted). And "[n]ot all of the ALJ's reasons must be valid as long as enough of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) (citations omitted).

The ALJ provided five reasons for discounting Charles's credibility: (1) treatment noncompliance; (2) Charles's cigarette smoking; (3) Charles's statements about smoking marijuana; (4) Charles's "minimal" mental health treatment; and (5) Charles's daily activities. (R. 28). Charles asserts that at least three of these reasons were invalid bases to reject his subjective symptom allegations. The Court agrees and further finds that the ALJ's statement about Charles's "minimal" mental health treatment lacked support in the record. In light of the numerous errors committed by the ALJ in evaluating Charles's subjective claims, the Court finds that the ALJ's credibility finding is patently wrong.

### 1. Noncompliance

Charles contends that the ALJ erred in finding that his subjective allegations were not fully supported by the evidence based on his noncompliance with prescribed treatment. Doc. [15] at 13-14. Throughout her decision, the ALJ repeatedly underscored Charles's noncompliance with respect to the compression stockings and anticoagulants prescribed to

him. (*See, e.g.*, R. 21, 23, 24). In her paragraph explaining her decision to discount Charles's testimony, the ALJ again referred to Charles's noncompliance with compression socks and prescription medicine. *Id.* at 28.

A claimant's statements about symptoms "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96–7p, 1996 WL 374186, at *7. However, "such evidence should not negatively affect an individual's credibility if there are good reasons for the failure to complete the plan." *Murphy*, 759 F.3d at 816 (citation omitted). As a result, "an ALJ may need to question the individual at the administrative proceeding to determine whether there are good reasons the individual did not seek medical treatment or fully comply with prescribed treatment." *Id*. (citations omitted). Good reasons for not following a treatment may include "an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (citations omitted). The Seventh Circuit has also held that mental health concerns may prevent a claimant from following treatment. *See Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) ("[M]ental illness in general ... may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment.").

In this case, the ALJ discounted Charles for his noncompliance even though she recognized that he lacked insurance:

> The record documents numerous episodes of noncompliance with respect to wearing the compression stocking, despite being told on numerous occasions that he needs to wear them during periods of activity. Meanwhile, the record also documents noncompliance with medical treatment with respect to taking anticoagulants, which have resulted in

> acute episodes . . . While I have taken into account that the claimant lacked medical insurance, I have also taken into account that the claimant's providers were aware of his financial situation and documented trying to help him obtain inexpensive or free healthcare on numerous occasions. In fact, Dr. McKenna even testified as to some of the challenges of using generic warfarin as he indicated that it allowed for less deviation from a strict diet than the brand name Coumadin.

(R. 28) (citations omitted). According to the ALJ, because Charles told his doctors that he could not afford various doctor visits, prescription medication, and prescribed compression stockings, and because some records show doctors tried to help him, that means that Charles was willfully noncompliant, and therefore less credible. The ALJ then confusingly cited to the medical expert's testimony in support of her finding that Charles was noncompliant and consequently incredible.[6] The ALJ's noncompliance finding is untenable.

Charles testified that he struggled with compliance during a portion of the relevant time period due to his inability to afford medications and follow-ups with doctors. When Charles and his wife separated in 2010, Charles was taken off of his wife's insurance. (R. 66-67). After that, according to Charles, he could not afford to pay for the brand name anticoagulant prescribed to him, Coumadin. *Id.* at 178-79. Charles testified that depending on the dosage, Coumadin cost Charles anywhere from $300 to $500 per month. *Id.* at 179. Charles testified that eventually he was switched to the generic warfarin anticoagulant

---

[6] Dr. McKenna testified that generic Warfarin is less powerful, that the dosage needs to be adjusted to cater to someone who has been on brand-named Coumadin, and that someone taking generic Warfarin has to be more careful with dieting. (R. 195-96). Dr. McKenna also testified that somebody who is compliant with Warfarin can regulate International Normalized Ratio levels. *Id.* Regardless, the vast majority of Charles's medical records from the relevant time period indicate that he was prescribed Coumadin, not Warfarin. *See, e.g., id.* at 665, 690, 749, 752, 1768. Consequently, the ALJ's reference to Dr. McKenna's testimony is puzzling.

while being treated by Aunt Martha's Health Care, but that when there were problems with the effectiveness of the drug, Charles was switched to Lovenox shots. *Id.* at 176-77. Charles further described the trouble he had with getting follow-up appointments. *Id.* at 180. Charles would go to the emergency room in pain, and while Charles would receive temporary treatment, he eventually would be told to follow up with a primary care doctor, but Charles did not have one. *Id.* In 2013, Charles was accepted to Rush's charity care program in 2013. *Id.* at 67, 1168, 1268. Once that happened, Charles was better able to comply with treatment because he was able to get the doppler and vascular studies his conditions required. *Id.* at 67, 1163-67, 1168-72, 1304-07.

Although the ALJ acknowledged Charles's lack of medical insurance, she still found him unreliable. As best the Court can tell, the ALJ did not think Charles's lack of insurance excused him because Charles's doctors were trying to help him. Unfortunately, the ALJ does not cite to any records after making this statement, nor does she cite any in the next paragraph when she repeats that "claimant's providers did work to assist the claimant in acquiring low-cost or charity care." (R. 28).

While the Court could find countless instances of Charles reporting to doctors that he could not afford Coumadin, compression socks, doctor visits, or antidepressants, *see, e.g.*, *id.* at 665, 711, 716, 859, 870, 881, 885, 893, 934, 991, 997, 1743, the Court could only find a few instances of Charles's doctors trying to assist Charles in obtaining free or inexpensive healthcare. In August 2011, Dr. Suh opined that Charles should be on Coumadin continuously but acknowledged that Charles could not afford it due to lack of insurance. *Id.* at 860. The doctor provided Charles some Coumadin and Lovenox and worked to get him an appointment to Will County Clinic. *Id.* However, Dr. Suh recognized

17

that Will County Clinic could not provide Coumadin or continuous follow-up to track his International Normalized Ratio (INR) readings. *Id.* In March 2012, Doctors Suh and Krishna documented working with a social worker and financial services to try to help Charles obtain the brand name prescriptions of Coumadin and Lovenox. *Id.* at 869, 871. In June 2012, Dr. Lakhani told Charles he could get generic medicine for his Hyperlipidemia from Wal-Mart for $4.00 per month. *Id.* at 936. This handful of incidents does not provide substantial evidence for the ALJ's noncompliance finding.

As Charles observes, the ALJ did not cite to any evidence that established that a counselor or social worker actually succeeded in obtaining low-cost medical care or medication for Charles during the relevant time period.[7] The record, in fact, demonstrates that Charles continued to struggle to afford the anticoagulants prescribed to him until he was accepted for charity care at Rush in 2013. *Id.* at 885, 893, 998, 1168. With respect to Charles's compression stockings, the ALJ speculated that Charles could afford them because they are "available over the counter at a low cost," *id.* at 30, without citing to any supporting evidence in the record or addressing the evidence in the record indicating that doctors prescribed compression stockings, which Charles stated cost him upwards of $400. *Id.* at 66, 152, 179, 1734, 1768, 1798.

Taking a step back, it is illogical to think that Charles's testimony about the pain and swelling he experienced is less reliable because doctors recognized he had insurance problems and tried to help him. If Charles claimed to be in extreme amounts of pain from his leg but never followed through with medication or sought treatment, even though he

---

[7] The ALJ also failed to ask Charles whether he received or pursued any free or inexpensive healthcare during the relevant time period, despite the fact that his financial situation was discussed at length in his hearings. (*See, e.g.*, R. 66-67, 152, 176-181).

had access to them, that would be one thing. *See Bulger v. Astrue*, No. 11 C 6835, 2012 WL 6567719, at *5 (N.D. Ill. Dec. 14, 2012). But that is not what the record presents here. Here, the record is clear that Charles lost his insurance and struggled with money once he was separated from his wife in 2010. After that point, Charles continued to seek out what care he could by going to the emergency department and explaining that he could not afford the brand name prescriptions or follow-up appointments the doctors were recommending. Once he gained charity care in 2013, Charles he was better able to comply with his treatment. (*See, e.g.*, R. 67, 1163-67, 1168-72, 1304-07). The fact that doctors attempted to help him a few times before that only reinforces Charles's claim that he could not afford treatment, for at the very least, his doctors believed that he could not afford treatment. *See Willis v. Colvin*, No. 12 CV 6417, 2014 WL 1031475, at *8 (N.D. Ill. Mar. 18, 2014) (using claimant's lack of access to prescription drugs to explain why she discredited his explanation for lack of treatment was circular).

Even if the evidence did support the ALJ's assumption that Charles had access to free or low-cost healthcare and medication in the relevant time period, the ALJ failed to explore at least two other good reasons Charles had for noncompliance. *See* SSR 96–7p, 1996 WL 374186, at *4; *Kangail*, 454 F.3d at 630. First, Charles reported that he received conflicting medical opinions from doctors regarding his use of Coumadin. Specifically in March 2012, Charles presented to the emergency room when he was experiencing leg pain, swelling, the feeling of a palpable cord in his left calf, chest pain, and shortness of breath. (R. 865). Charles reported that he had been taken off of Coumadin for three months by his treatment provider at the Will County Health Department, despite Dr. Lakhani's previous instruction that Charles would need to be on Coumadin for life. *Id*. Second, during the

periods of noncompliance, Charles attempted to commit suicide and was suffering from depression. *See id.* at 790, 874, 992. While the ALJ listed both of the above in her lengthy recitation of Charles's medical history, as well as the fact that Charles reported to doctors in July 2010 that he stopped taking Coumadin for two days when he was feeling depressed, *id.* at 24, 784, the ALJ failed to assess how or whether those factors played a role in Charles's noncompliance. The ALJ's discounting Charles for noncompliance is therefore invalid.

The Commissioner defends the ALJ's noncompliance decision based on the fact that Charles's doctors noted that Charles was noncompliant. Doc. [22] at 9. True, but the doctors did not conclude that Charles's instances of noncompliance meant that he was not suffering very real symptoms created by his genetic mutation, DVT, or depression. Instead, they acknowledged that he lacked insurance and was struggling financially, and on occasion, even tried to help him. It is therefore unclear why the doctors having noted Charles's noncompliance supports the ALJ's credibility inference. The Commissioner also argues that the ALJ did not have to "ignore all the instances of noncompliance reported by plaintiff's own providers." Doc. [22] at 9. That is correct, but ignores the Seventh Circuit's holding that evidence of noncompliance "should not negatively affect an individual's credibility if there are good reasons for the failure to complete the plan." *Murphy*, 759 F.3d at 816 (citation omitted). The ALJ's decision to discount Charles for his noncompliance was erroneous in this case.

20

### 2. Smoking

Charles next argues that the ALJ erred in finding that Charles's subjective allegations were not fully supported based on Charles's failure to stop smoking. Doc. [15] at 14-15.

The Seventh Circuit disfavors the discounting of an ALJ's credibility based on a claimant's failure to stop smoking. In *Shramek v. Apfel*, the ALJ found the claimant incredible, based in part on the claimant's failure to quit smoking despite evidence that smoking could worsen her condition. 226 F.3d 809, 812 (7th Cir. 2000). The court found that "even if medical evidence had established a link between smoking and her symptoms, it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful." *Id.* at 813. The Seventh Circuit reasoned that "[g]iven the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health," and that "[o]ne does not need to look far to see persons with emphysema or lung cancer— directly caused by smoking—who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop." *Id.* The *Shramek* Court thus concluded that a claimant's smoking is "an unreliable basis on which to rest a credibility determination." *Id.*

In an earlier decision from the Seventh Circuit, *Rousey v. Heckler*, the court similarly held that the ALJ's denial of benefits was not supported by substantial evidence where the ALJ concluded that the claimant could not receive benefits because she "continues to smoke up to one-half pack of cigarettes a day although warned not to do so by her doctor." 771 F.2d 1065, 1069 (7th Cir. 1985). Central to the court's decision was

that none of the physicians opined that the claimant "would be restored to a non-severe condition if she quit smoking her half-pack of cigarettes." *Id.* The *Rousey* Court further stated that "[n]one of the medical evidence linked her chest pain directly to the smoking of cigarettes and it was not proper for the ALJ to independently construct that link." *Id.* at 1070.

Following *Shramek* and *Rousey*, courts in this Circuit have found the rejection of a claimant's subjective symptom allegations based on smoking to be erroneous. *See, e.g.*, *Suess v. Colvin*, 945 F. Supp. 2d 920, 930-31 (N.D. Ill. 2013); *Tincher v. Colvin*, No. 13 C 8410, 2015 WL 4253632, at *2 (N.D. Ill. July 14, 2015); *Croarkin v. Colvin*, No. 12 C 7819, 2014 WL 274054, at *7 (N.D. Ill. Jan. 24, 2014). In one such case, the Seventh Circuit even suggested that it was improper for an ALJ to summarily dismiss a claimant's subjective claims based on smoking where the record contained no information about either the price of medication or the cost of the claimant's cigarette habit. *Eskew v. Astrue*, 462 F. App'x 613, 616 (7th Cir. 2011).

Here, the ALJ did discount Charles for smoking, stating: "the record documents consistent smoking of approximately one pack of cigarettes per day, which increases the risk of blood clots and is also money that could be used to pay for needed medical treatment." (R. 28). To the ALJ's credit, the medical record in this case does show that Charles's doctors asked him to stop smoking, and that smoking increased his chance of blood clots. *See, e.g.*, *id.* at 692. Yet the medical record does not show that Charles's severe impairments of lupus anticoagulant syndrome, gene mutations associated with increased risk of venous thrombosis, or depression would become non-severe as a result of Charles's discontinued smoking. Moreover, common sense does not support the ALJ's conclusion.

Charles testified that cigarettes during the relevant time period cost around $5.50 or $5.75 a pack, and he reported to doctors during the relevant time period that he smoked anywhere from one half (.5) to one and a half (1.5) packs of cigarettes daily. *Id.* at 152, 692. Even if Charles smoked 1.5 packs of cigarettes at $5.75 per pack, it is unlikely that that cost would cover the cost of Charles's Coumadin, compression stockings, anti-depressants, and follow-up appointments. *See Loftis v. Berryhill*, No. 15 C 10453, 2017 WL 2311214, at *9 (N.D. Ill. May 26, 2017). Perhaps more importantly, Charles testified that his wife paid for cigarettes until they separated in 2010, and that his roommate paid for them after that. (R. 151-52). Given all of that, plus the addictive nature of smoking, the ALJ's reliance on Charles's smoking to discount his credibility was wrong in this case.

The Commissioner's response neglects to address any of the above-discussed case law. The Commissioner states, without support, that it was not an error for the ALJ to consider Charles's smoking, and that it was proper for the ALJ to "draw the common-sense conclusion that purchasing cigarettes cost[s] money that could have been used for needed medical treatment." Doc. [22] at 10. Because the Commissioner's rejoinder fails to deal with the pertinent case law and facts—such as *Shramek* or the fact that Charles testified that he relied on his wife and roommate to buy cigarettes for him—his argument fails. The Commissioner also points out that neither Charles's noncompliance nor his continued smoking were the only factors considered by the ALJ in evaluating Charles's subjective symptoms. *Id.* Granted, but because the ALJ's reliance on Charles's daily activities and her statement about Charles's "minimal" mental health treatment are also invalid, the ALJ's subjective symptom analysis is patently wrong in this case. *See Halsell*, 357 F. App'x at 722-23.

### 3. Daily Activities

Charles's third subjective symptom argument is that the ALJ erred in relying on Charles's activities of daily living in finding that Charles's subjective allegations were not fully supported by evidence. Doc. [15] at 15-16. While daily activities may be used to discredit a claimant's testimony, *see Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (citations omitted), the Seventh Circuit has denounced decisions which fail to recognize the "critical differences" between activities of daily living and activities in a full-time job, such as flexibility in scheduling, getting help from others, and not being held to a minimum standard of performance. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). *See also Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (remanding where claimant's ability to do limited work to maintain his small farm did not adequately support ALJ's conclusion that he would be able to work full time). "Without acknowledging the differences between the demands of such activities and those of a full-time job, the ALJ [is] not entitled to use [the claimant's] performance of life activities as a basis to determine that [his] claims of a disabling condition [are] not credible." *Ghiselli v. Colvin*, 837 F.3d 771, 777-78 (7th Cir. 2016). For instance in *Cullinan v. Berryhill*, the Seventh Circuit remanded the decision of an ALJ who drew an "impermissible inference[]" by relying on a claimant's ability to perform household chores without explaining "why doing [the] household chores was inconsistent with [claimant's] description of [ ] pain and limited mobility," and where no inconsistency was obvious. 878 F.3d 598, 603-04 (7th Cir. 2017).

Throughout her decision, the ALJ referred to a third party function report from Stacy Nava, at one point stating "[t]he claimant has a wide variety of abilities as indicated by his testimony and Ms. Nava's third-party function report, including custody of his

children since 2010, the ability to drive, manage bills, cook, care for pets, and grocery shop." (R. 20). The ALJ subsequently stated that Stacy Nava's report "noted that [Charles] fed the dog, shopped for groceries, paid all bills, and talked with others daily." *Id.* at 28.

Contrary to the ALJ's conclusions, Charles's testimony portrayed fairly restricted activities of daily living. Charles testified that he does not really cook, and that he has to take breaks when doing chores like laundry or the dishes. (R. 59, 182). According to Charles, he gets out of breath and cannot stand on his left leg for too long. *Id.* at 59. Charles also testified that he did not do much driving at all, due to the pain and swelling that occurs when he sits in a car for too long. *Id.* at 59-60, 62, 186. Charles would normally just drive to the grocery store, a park that was 4 to 5 blocks away, or to take his kids to school. *Id.* at 173-74, 169, 186. Charles reported that he liked to stay close by in case of an emergency. *Id.* at 186-67. Charles also testified to relying on his family and friends a lot for daily activities. For instance, Charles said that his daughters helped him with laundry and grocery shopping, and that his friend helped him pay bills, grocery shop, and would even take his daughters to the park for him sometimes. *Id.* at 167, 173-74, 181-83, 189, Before he and his wife separated in 2010, Charles relied on his step-daughters and wife to complete the chores in the house. *Id.* at 168, 185.

Stacy Nava, a family friend, filled out a third party function report in June 2012, which similarly portrayed limited activities of daily living. In it, she stated that Charles "has a hard time doing a lot of what is needed. He is always tired. Due to lack of medication, he has been in and out of the hospital." (R. 559). Ms. Nava further reported that Charles was trying to fix up the house, spends time with his children, and has been looking for help to get assistance with medicines, food, and shelter. *Id.* at 560. Ms. Nava

stated that Charles's children were with Charles's wife until he could find housing. *Id.* While Ms. Nava said that Charles had a dog, she also noted that Charles was currently staying with her family, and that they helped feed the dog. *Id.* Ms. Nava's report conveyed that Charles did not have issues with personal care but that she was not sure if Charles needed help with medicine, or if Charles had trouble sleeping at night. *Id.* Although Ms. Nava wrote that Charles could prepare all foods, she did not believe he was preparing any meals at the time, and that "[s]omeone else does the cooking." *Id.* at 561. In terms of housework, Ms. Nava wrote that Charles can do chores but needs to take frequent breaks and gets tired quickly. *Id.* She also stated that his depression could cause Charles to procrastinate. *Id.* Ms. Stava additionally related that Charles could drive, get groceries, handle his money, and talk to his friends. *Id.* at 563. Ms. Stava described her friend as being more moody and quick tempered now, and said that he was homeless and has been moving from friend's house to friend's house for the last year. *Id.* at 564.

The ALJ nevertheless pointed to Charles's testimony and Ms. Nava's third party report to suggest that Charles had a wide variety of abilities. (R. 20). The ALJ's daily activities credibility assessment is problematic for at least two reasons. First, the ALJ's statement that Charles had a "wide variety of abilities" exaggerates his daily activities and is not supported by the record. For instance, the ALJ seized on Charles's ability to cook, based on Ms. Nava's report and Charles's testimony, but Charles testified that he did not "really cook" and could only do "little things." *Id.* at 59. Ms. Nava likewise said in her report that someone else does the cooking. *Id.* at 561. In a related manner, the ALJ disregarded Charles's limitations in performing these activities. The ALJ did not discuss the fact that Charles could only drive short distances, that his friend helped him pay his

bills, that others cooked for him, that his friends helped feed his dog, and that his family and friends assisted him in housework and grocery shopping. *Id.* at 59-60, 168-174, 182. The ALJ likewise neglected to recognize that Charles's activities took him 2-3 times as long now, and that he had to take frequent breaks due to fatigue. *Id.* at 182, 561. The ALJ's discussion of daily activities was therefore improper in part because the ALJ exaggerated Charles's daily activities and failed to consider the qualifications on those activities. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (citations omitted) ("an ALJ cannot disregard a claimant's limitations in performing household activities"); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (emphasis in original) ("The ALJ ignored Craft's qualifications as to *how* he carried out those activities . . . . Each activity left him exhausted.").

Second, the ALJ failed to explain why Charles's reported daily activities were inconsistent with his DVT, gene mutation, and depression. An ALJ must "explain the 'inconsistencies' between [a claimant's] activities of daily living . . . complaints of pain, and the medical evidence." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (citation omitted). The ALJ here did not explain how Charles's having custody of his kids, feeding his dog, shopping for groceries, or talking to others daily was inconsistent with his claims of having severe chest pain, swelling and pain in his left leg, and depression. And, perhaps more importantly, no inconsistencies are apparent. Take grocery shopping for example, Charles testified that his daughters helped him make the grocery trip as fast as possible, and that walking up the stairs after grocery shopping caused Charles pain and fatigue, such that he would need to sit and elevate his leg afterwards until the pain subsided enough for Charles to do anything else. *Id.* at 182-83. Charles's custody of his children for only half

of the relevant time period—he lived with his wife until 2010—is not inconsistent with his claims either. Charles testified that his friends helped him with his daughters, who were of school-age, and that his younger daughter was saddened by the fact that Charles was unable to play with her. *Id.* at 62, 168, 189. Charles's daughters helped Charles with housework and grocery shopping as well. *Id.* at 173-74, 182. Charles also testified that his custody arrangement was just an agreement with his wife, who he is not formally divorced from. *Id.* at 207. The record does not show that Charles was granted custody for being a fit parent, and as Charles maintains, a claimant may suffer debilitating pain and symptoms and may still care for children out of necessity. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). Necessity also likely explains why Charles talks to his friends daily, as the record indicates his friends helped him take care of his bills, dog, and children. (R. 167, 173-74, 181-83, 189, 560). Furthermore, Charles probably had to talk to friends daily, as he was moving from one friend's house to another's during the relevant time period, due to his homelessness. *Id.* at 564.

To sustain full-time employment, Charles needs to be able to remain on task, with limited breaks, and perform to specific standards. *See Bjornson*, 671 F.3d at 647. Charles's ability to feed his dog, pay his bills, and grocery shop in the limited way described above does not indicate that Charles could hold down a fulltime job, and the ALJ fails to explain how those activities were inconsistent with his subjective symptom allegations. The ALJ's daily activity analysis was therefore erroneous. *See Cullinan*, 878 F.3d at 603-04.[8]

---

[8] The Commissioner, once again, does not address any caselaw, nor Charles's specific argument that the ALJ failed to explain how Charles's ability to prepare simple meals or care for a pet suggested that Charles had exaggerated the limiting effects of his impairments. Instead, the Commissioner simply states that there was no error in the ALJ's consideration of Charles's daily activities, and that the ALJ "reasonably concluded that plaintiff's activities prior to April 9, 2013, were not consistent with his allegations of disability." Doc. [22] at 10. The Commissioner's

### 4. "Minimal" Mental Health Treatment

Finally, in her assessment of Charles's subjective symptom allegations, the ALJ intimated that Charles's mental health allegations were unreliable because she found his mental health treatment to be minimal: "The claimant's mental health treatment has also been minimal despite his complaints." (R. 28). This reason for discounting Charles's credibility is unsound.

As an initial matter, the ALJ's assessment of Charles's mental health treatment as "minimal" lacks support in the record. Charles was consistently prescribed antidepressants, such as Zoloft, Cymbalta and Lexapro, throughout the relevant time period. *See, e.g.*, *id.* at 789, 804, 849. Charles also reported to the hospital on at least three occasions in connection with mental health concerns, and was admitted to the psychiatric ward on two of those occasions. For instance, in July 2010, Charles was admitted to St. Joseph Hospital with suicidal ideation, at which time he was diagnosed with major depression and assigned a one-to-one sitter. *Id.* at 784-790. He was started on numerous antidepressants and had individual and family sessions with a therapist as part of a 4-day stay in the psychiatric unit of the hospital. *Id.* at 804. In February 2011, Charles was admitted to the hospital after attempting suicide by overdose. *Id.* at 815. He was admitted to the psychiatric unit again, at which point he was prescribed medicine and attended group therapy. *Id.* at 815-16, 849. The record shows that Charles had some psychiatric treatment at Will County Behavioral Health as well. *Id.* at 704-25. The Court wonders what would constitute non-minimal treatment to the ALJ, if prescriptions to antidepressants, talk

---

undeveloped argument is easily rejected. *See United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) ("We have repeatedly and consistently held that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.' ").

therapy, two admissions to psychiatric wards, and numerous psychiatric consults do not suffice.

To the extent that Charles's mental health treatment had gaps, those gaps are explained by Charles's inability to afford mental health treatment. Charles reported to doctors on several occasions that, without insurance, he could not afford the therapy appointments or to have his antidepressant prescriptions filled. (*see, e.g.*, R. 709, 711, 716). In contrast to the ALJ's general noncompliance conclusion, the ALJ did not even acknowledge Charles's lack of insurance in connection with his purported "minimal" mental health treatment. Because the record shows that Charles's mental health treatment was anything but minimal, and because Charles had a "good reason" for any gaps in his mental health treatment, the ALJ's finding that Charles was incredible because of his mental health treatment is improper.

In summary, the ALJ's subjective symptom analysis was erroneous in at least four ways. The ALJ improperly discounted Charles's credibility based on his noncompliance, despite Charles's inability to afford treatment. The ALJ wrongly discredited Charles for his failure to stop smoking. The ALJ exaggerated and overemphasized Charles's activities of daily living, without explaining the inconsistencies. Finally, the ALJ discredited Charles in light of her unsupported perception that Charles's mental health treatment was minimal. The cumulation of these errors shows that the ALJ's subjective symptom analysis in this case was patently wrong. That erroneous symptom analysis was not harmless, "as it informed several aspects of the ALJ's findings with respect to [Charles's] residual functional capacity and consequently [his] ability to perform past relevant work or to adjust to other work." *Ghiselli*, 837 F.3d 771 at 779. At the very least, the ALJ's credibility

assessment appeared to have impacted her decision to omit stricter mental limitations in the RFC, in light of Charles's purportedly "minimal" mental health treatment. Charles's case must therefore be remanded.

On remand, the ALJ must reweigh Charles's subjective symptom allegations without committing the errors discussed above. The ALJ further must reconsider Charles's testimony and his doctors' recommendations regarding the need for leg elevation during the relevant time period. If the ALJ chooses to omit a restriction allowing for leg elevation in the RFC, she must explain why, so that the Court can conduct a meaningful review of that decision.

## CONCLUSION

For the foregoing reasons, Charles's motion for summary judgment [15] is granted in part and denied in part, the Commissioner's Motion for Summary Judgment [22] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant Commissioner of Social Security.

**SO ORDERED.**

Dated:  October 19, 2020

_____

Sunil R. Harjani
    United States Magistrate Judge